UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.          Plaintiff,<br><br>DANIEL GEORGE FISHER,<br><br>            Defendant. | Criminal No. 16-300 (1) (WMW)<br><br>**DEFENDANT'S SENTENCING POSITION** |

**A Hollow but Misguided Threat**

Daniel Fisher had all of his things in his backpack. He had some clothes and a small collection of precious items that kept him feeling human: some letters from a woman, a few photographs, an address book. He didn't have much but he didn't want much or need much. He was used to a simple life. During the warmer weather, he was happy enough walking the streets of Minneapolis and St. Paul, resting when he needed to, bouncing among homeless shelters and parking ramps to sleep.

He had issues earlier in his life with cocaine when he moved to Chicago in 2003 and his girlfriend introduced him to the drug. First by association, then by his own habit, he began using cocaine when he could and over the course of several months became homeless for the first time in his life. He fortunately realized that this was not the path he wanted, and he sought a different way. With the help of a local pastor, he traveled to Minnesota and enrolled in a treatment program. Though it took two efforts over several years, he conquered his addiction successfully. He still occasionally had a drink or two but it never got out of control and he avoided all other drugs conscientiously.

The treatment program assisted him with housing, and he remained in a boarding house for six or seven years in the Twin Cities. Though he had regular employment as a young man in Milwaukee, his home town, he was unable to muster more than periodic temporary work. Eventually, in 2013, he was finally unable to meet his rent obligations, and he became homeless once again. He was arrested on September 6, 2016.

Mr. Fisher has lived at the margins of society for the better part of his adult life. He does not complain about his lot in life, though as with most people, he has his share of regrets and a small share of hope that the future might bring better things. His biggest source of pain in recent years has been a relationship he developed with a woman he met in 2012. He fell in love with her, but she suffers from significant mental health issues, and their relationship appears to have sputtered out late in 2016. At times in his life, Mr. Fisher has experienced depression, and this has usually been triggered by relationships ending.

Despite his homelessness and earlier history of addiction, Mr. Fisher has never caused any significant problems in the community. His criminal history score is zero. There is nothing in his history to suggest any propensity for violence, the use of weapons, or any other behavior that might alarm the public. By and large, he has simply lived quietly at the edges of society, mostly invisible to most of us, bothering no one.

During the summer of 2015, Mr. Fisher was homeless and reeling from another poor incident with his girlfriend. As he wandered the streets, he noticed construction

beginning on a new Islamic community center near where he used to live. On that particular day, depressed and despairing of a normal relationship with his troubled girlfriend, seeing this construction made him angry. He lashed out. He wrote an anonymous letter that threatened to blow up the center unless it moved. He had no intention of following through with this; indeed he had absolutely no means to do so even if he wanted.

    Law enforcement quickly identified Mr. Fisher, and when they interviewed him to investigate the seriousness of the threat, they readily recognized that he posed no real threat. Mr. Fisher immediately confessed to his actions, expressed his remorse, and understood why his words did genuinely frighten others. Law enforcement examined Mr. Fisher's internet presence and did not discover anything to suggest that Mr. Fisher was affiliated with any racist or anti-Muslim organizations or communities. He promised never to write a similar letter ever again. At that time, they didn't even arrest him. He was not arrested until approximately three months later. He had not done anything else in the interim to generate any further concern of same or similar behavior.

    At all times, Mr. Fisher has accepted responsibility for his actions and poor judgment. He has expressed extreme remorse throughout. He has never done anything like this before, and his is unlikely to do anything like this again in the future. His acting out in this manner was truly anomalous.

I.      **Status of the Case**

Daniel Fisher, through undersigned counsel, respectfully submits the following position regarding sentencing. On November 30, 2016, he appeared before the Court and entered a guilty plea to one count of Obstruction of Persons in the Free Exercise of Religious Beliefs, 18 U.S.C. Section 247(a)(2) and (d)(3). This plea was entered pursuant to an agreement between Mr. Fisher and the government, a copy of which has been filed with the Court.

A final Presentence Report (PSR) calculates Mr. Fisher' total offense level as 13, his criminal history category as I, and an advisory sentencing range of 12-18 months incarceration. Neither party objects to these advisory guideline calculations.

Mr. Fisher respectfully requests that the Court impose a sentence of six (6) months followed by a term of supervised release. Recognizing the nature of the offense conduct and its causes, Mr. Fisher respectfully suggests that the Court add the following terms to his supervised release term: (1) that Mr. Fisher participate in mental health treatment; (2) that he remain law abiding; (3) that Mr. Fisher write letters of apology to the organization that he threatened; and (4) that he has no further contact with the organization that received his letter.

Mr. Fisher completely understands the seriousness of his offense. During the course of this case, he has come to realize how scary his conduct was to others, and he desperately wishes that there was some way to undo what he did. His unthinking lashing

out was a product of his personal circumstances, to selfishly make himself feel better about his deteriorating relationship and poor life prospects. Though this was a highly inappropriate and unacceptable manner to deal with personal issues, it remains important to distinguish Mr. Fisher's motivations from someone who intends more. Again, Mr. Fisher does comprehend that the people and organizations who receive such threats have no ability to distinguish between those two types of people, and his remorse for causing them fear is palpable. Nonetheless, for purposes of sentencing, it is necessary to incorporate Mr. Fisher's motivations since it bears upon such sentencing factors as specific deterrence, protection of the public, the necessity for rehabilitative services, et cetera.

     In this instance, a sentence of six (6) months would properly account for all the sentencing factors subsumed in 18 U.S.C. Section 3553(a). Specifically, the prompt manner in which Mr. Fisher has accepted responsibility for his crime, the circumstances of his offense conduct, and the extremely low likelihood that he will commit a similar offense in the future in light of his history. Furthermore, any residual concerns regarding Mr. Fisher's propensities can be monitored during a period of supervised release, during which the Court would continue to have the authority to address any emerging concerns. Such a sentence would also comport with the statutory directive to fashion a sentence that is sufficient but not greater than necessary to satisfy the various goals of sentencing.

### III. Timeline of the Prosecution

The Tawfiq Islamic Center received Mr. Fisher's letter on September 30, 2015. Law enforcement identified Mr. Fisher as its author after taking fingerprints from that letter. Law enforcement reviewed Mr. Fisher's internet usage and did not see anything that alarmed them. They did not arrest him initially, correctly perceiving that he posed no real threat and was being entirely honest with them, and only did so after the federal government chose to bring this case.

At all times, Mr. Fisher has been remorseful and cooperative. There were never any issues during his arrest or his interview with law enforcement. He was not found with any weapons.

The government filed a criminal complaint against Mr. Fisher on August 31, 2016, about eleven (11) months after the offense conduct ended. During that elapsed period, Mr. Fisher has done nothing even remotely similar and has had no other issues whatsoever.

### IV. Sentencing Factors Pursuant to 18 U.S.C. § 3553(a)

When imposing sentence, the Court must consider the factors delineated in 18 U.S.C. § 3553(a). In the final analysis, the Court is required to make sure that any sentence selected is "sufficient, but not greater than necessary" to meet the purposes of punishment. § 3553 (a)(2).

While the advisory guideline calculation remains an important consideration and

stands at the starting point for sentencing judges, it is "not the only consideration" in determining the appropriate sentence. *Gall v. United States,* 552 U.S. 38, 49 (2007). To the contrary, the guidelines "'reflect a rough approximation of sentences that *might* achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)) (emphasis added). A sentencing court "may not presume that the Guidelines range is reasonable." *Gall,* 552 U.S. at 50 (citing *Rita*, 551 U.S. at 351). Rather, the sentencing court must make an "individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. Above all, a court's final determination of a sentence must reflect "§ 3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals advanced in 3553(a)(2)," namely, retribution, deterrence, incapacitation, and rehabilitation. *See Kimbrough*, 552 U.S. at 111.

In making these individual assessments, sentencing courts are free to disagree with the guidelines' recommended sentence in any particular case, and may impose a different sentence based on a contrary view of what is appropriate under § 3553(a). This includes the freedom to disagree with "policy decisions" of Congress or the Sentencing Commission that are contained in the guidelines. *See Pepper v. United States*, 131 S. Ct. 1229, 1241 (Mar. 2, 2011) ("[O]ur post-*Booker* decisions make clear that a district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views.... That is particularly true where, as here, the

Commission's views rest on wholly unconvincing policy rationales not reflected in the sentencing statutes Congress enacted."); *Spears v. United States*, 129 S. Ct. 840, 843 (2009) (confirming *Kimbrough's* holding that courts may vary from particular guideline because of policy disagreement with that guideline) (*per curiam*).

Mr. Fisher respectfully believes that the 3553(a) factors support a sentence of six (6) months with a period of supervised release to follow. Such a sentence would comport with the statutory mandate that a sentence be sufficient but not greater than necessary.

### A. The History and Characteristics of Mr. Fisher

This is by far the most serious error of judgment that Mr. Fisher has committed in his life. He is highly ashamed of his behavior. His conduct here, however, is also highly anomalous and extremely unlikely to ever happen again.

Mr. Fisher promises that the consequences of this instant case are sufficient to prevent him from making this mistake again. Mr. Fisher clearly understands how this situation came to be and how he exercised poor, short-term judgment by engaging in the offense conduct. In his own words:

> I am sorry that I scared people at the Islamic Center where I sent my letter. I was angry after the shooting in Orlando, Florida, and I saw that there were plans to build a mosque in my old neighborhood. I wrote my letter thinking that it might cause the people there to build their mosque somewhere else. I was never going to hurt anyone, I was just trying to get them to move. I do realize, however, that my letter was scary, and I regret my impulsive decision to send to the, what I wrote. That was wrong, and I know that I was wrong to judge people who had nothing to do with what happened in Florida. I've already written a letter to the people at the Islamic Center apologizing for my behavior. I apologize again, with all my heart.

**B.     The Need for Deterrence and to Protect the Public**

Mr. Fisher promises the consequences of this instant case is sufficient to prevent him from making this mistake again.  He had never done anything life this before, and since this isolated instance, a period of eleven (11) months when law enforcement was clearly satisfied that he posed no real threat and thus left him free to do as he wished, Mr. Fisher has done nothing to contradict his promise that he would not do this again.  Thus, although general deterrence still applies as a reasonable consideration, specific deterrence and the need to protect the public in the future from further crimes by Mr. Fisher are of minimal concern in this instance. Mr. Fisher was not prone to such behavior prior to this event and is extremely unlikely to engage in anything even remotely similar in the future.

The sentencing statute requires the Court to consider the "need for the sentence imposed . . . to afford adequate deterrence to criminal conduct" and the need to "protect the public from further crimes of the defendant."  18 U.S.C. §§ 3553(a)(2)(B) & ©. While many believe that the higher the sentence, the greater the effect in deterring others, the empirical research shows no relationship between sentence length and deterrence. The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one. But the most pertinent question for this Court is imprisonment is minimally necessary to serve this purpose of sentencing. And, in Mr. Fisher's particular circumstances, the answer is a resounding "no."

After more than two decades of extraordinary growth in the use of incarceration as a sanction for criminal conduct, players from across the criminal justice spectrum are beginning to question its efficacy on a number of fronts, including its efficacy as a deterrent. In a speech at an event sponsored by the Vera Institute of Justice, former Attorney General Eric Holder noted that the still-growing rates of incarceration are having little effect on crime rates.

> [W]hile prison building and prison spending continue to increase, public safety is not improving. Since 2003, spending on incarceration has continued to rise, but crime rates have flattened. Indeed, crime rates appear to have reached a plateau, and no longer respond to increases in incarceration.

*See* Remarks as prepared for delivery by Attorney General Eric Holder at the Vera Institute of Justice's Third Annual Justice Address (event held July 9, 2009).[1] *See also* PUNISHMENT & INEQUALITY ch. 7 (Did the Prison Boom Cause the Crime Drop?) (reviewing and evaluating research regarding effects of incarceration on crime rates and concluding that evidence "suggests that mass imprisonment helped reduce crime and violence in the United States in the late 1990s, but the contribution was not large").

The government can point to nothing - no study, no empirical evidence - in support of its position that a guideline range sentence is any more effective in terms of specific or general deterrence than a sentence of probation. In contrast, there is evidence

---

[1]Available at http://www.vera.org/download?file=2864/AG-Eric-Holder-Justice-Address-Transcript.pdf.

demonstrating that prison may heighten the risk of recidivism. *See e.g.*, THE SENTENCING PROJECT, INCARCERATION AND CRIME: A COMPLEX RELATIONSHIP 7 (2005) ("The rapid growth of incarceration has had profoundly disruptive effects that radiate into other spheres of society. The persistent removal of persons from the community to prison and their eventual return has a destabilizing effect that has been demonstrated to erode family and community bonds, and contribute to an increase in recidivism and future criminality.") (footnote and citation omitted). *See also generally* JUSTICE STRATEGIES, CHILDREN ON THE OUTSIDE: VOICING THE PAIN AND HUMAN COSTS OF PARENTAL INCARCERATION (2011) (discussing effects of parental incarceration on children's emotional and economic well-being).[2] In contrast to an argument about the *length* of the sentence, it is, rather, the *certainty* of sentence, not the severity of sentence, that imparts the deterrent effect.

Moreover, the Court has the threat of prison to hold over Mr. Fisher during a supervised release term if he were tempted to commit any further criminal activity; that *certain* punishment constitutes the most effective deterrent that exists because Mr. Fisher is now made aware specifically that punishment, specifically, further federal prison, will follow any similar errors of judgment.

Because sufficient deterrence can be achieved with a six (6) month sentence, Mr.

---

[2] Available at http://www.justicestrategies.org/sites/default/files/publications/JS-COIP-1-13-11.pdf.

Fisher requests that the Court impose a sentence without undue regard to the advisory range.

This also true when analyzed through the lens of whether there is any need to protect the public from further crimes. Not only does the foregoing apply in this context as well, it is also true that law enforcement was quickly satisfied that Mr. Fisher posed no actual threat despite his letter. He was not arrested at the time, and formal charges were not filed for almost a year after he sent his letter.

Accordingly, the need to protect the public from future crimes has already been assuaged by the passage of time during which Mr. Fisher has demonstrated no ongoing proclivity for similar behavior, affirming his prior history that generated a criminal history score of zero.

### C. The Punitive Purpose of Sentence Can Be Achieved with a Probationary Sentence.

For Mr. Fisher, the punitive purpose of sentencing can be achieved with a sentence of six (6) months. That is because the punitive effect of any sentence is not viewed in a vacuum by simple, bland reference to an offense; rather, that effect is, and must be, measured against Mr. Fisher and his individual case. For him, even a below-guideline sentence represents significant punishment because he has never been to prison before. Indeed, Mr. Fisher only prior experience with custody was a three-day sentence in a local jail.

Finally, were this Court to have any concerns that a six (6) month sentence would

not adequately punish Mr. Fisher, the ensuing years of supervision should assuage those concerns. During that time, he will be strictly monitored by United States Probation. Any failure to comply with the conditions that this Court sets will result in a violation and the threat of further prison; the repercussions from the Court will be swift and severe. Thus, a sentence below the advisory range adequately achieves the goal of punishing Mr. Fisher.

### D. The Rehabilitative Purpose of Sentencing Warrants a Sentence Below the Advisory Range.

Section 3553(a)(2)(D) requires the Court to consider "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." This purpose militates strongly in favor of a sentence below the advisory range. As a preliminary matter, Congress has explicitly directed that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). In other words, locking someone up neither achieves nor is a substitute for rehabilitation or achieving the goals set forth in § 3553(a)(2)(D). Thus, imprisoning Mr. Fisher for any term cannot be justified on the basis of offering him any psychological or medical rehabilitation.

Thus, a sentence of six (6) months is appropriate for Mr. Fisher because it achieves the goals of sentencing. Since prison may not be used to further rehabilitation, that purpose does not militate in favor of a sentence in the mechanically calculated range; in

fact, the criminogenic effects of incarceration militate *against* incarceration.

### E. A Below-Range Sentence Does Not Run Afoul of the Goal of Avoiding Unwarranted Disparity Because It Is a *Warranted* Disparity.

The Court must also consider the need to avoid unwarranted disparities among similar offenders. 18 U.S.C. § 3553(a)(6). However, this preference is not to avoid all disparities at all costs. Rather, it is to avoid *unwarranted* disparities; disparity remains an ameliorative tool to adjust the guidelines because "[f]air sentencing is individualized sentencing." *Fifteen Years of Guidelines Sentencing*, at 113 (Nov. 2004). As this memorandum has demonstrated, the proposed guideline range of imprisonment in this instance is at odds with the 3553(a) factors – specifically, the factors of the history and nature of Mr. Fisher, the need for specific deterrence, to provide just punishment, and the need to protect the public – and thus warranting a variance and thus avoiding an unwarranted sentencing disparity.

Again, any concerns the Court might have regarding Mr. Fisher' future propensity can be readily assessed during a supervised release period.  Mr. Fisher understands that punishment, specifically a term of incarceration in federal prison, almost certainly awaits him if any further similar errors of judgement occur during this period and beyond.

Moreover, the expense of incarcerating a federal inmate to the American public is staggering.[3] As the Court is aware, innumerable conversations are underway currently

---

[3]As reported by the PSR, the annual cost of incarceration to the Bureau of Prisons is $31,976 per inmate.  (PSR ¶ 73.)

regarding the intersection of budget constraints and an effective, efficient administration of justice. When the factors of deterrence and recidivism are minimal, a lesser sentence is warranted.

**V.     Conclusion**

For all the foregoing, Mr. Fisher respectfully requests that the Court impose a sentence of six (6) months followed by a term of supervised release.  Such a sentence would be sufficient but not greater than necessary to comply with the various purposes of sentencing.

Put most succinctly, Mr. Fisher made a poor but highly anomalous decision at a particularly low point in his life.  All indications strongly suggest that he will never be before this or any other court in the future for similar transgressions.

Dated:   February 21, 2017                                        Respectfully submitted,

*s/ James S. Becker*

_____
JAMES S. BECKER
Attorney ID No. 388222
Attorney for Defendant
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415